IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| RHONDA STARKEY, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | No. 2:05-cv-042 |
| | ) | |
| JO ANN B. BARNHART, | ) | Judge Thomas M. Hardiman |
| Commissioner of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION

**I.     Introduction**

Plaintiff Rhonda Starkey (Starkey) brings this action pursuant to 42 U.S.C. §405(g) and §1382(c) of the Social Security Act (Act), seeking review of the final determination of the Commissioner of Social Security (Commissioner) denying her application for supplemental security income (SSI). This matter is before the Court on the parties' cross motions for summary judgment under Rule 56 of the Federal Rules of Civil Procedure based on the record developed at the administrative proceedings.

After careful consideration of the Administrative Law Judge's (ALJ's) decision, the memoranda of the parties and the entire record, the Court finds the ALJ's decision is supported by substantial evidence. Therefore, Plaintiff's motion for summary judgment will be denied and the Commissioner's determination will be affirmed.

II.     **Procedural History**

Plaintiff Starkey applied for SSI on November 3, 2002, alleging disability as of July 1,

2001 because of narcolepsy and depression. (R. 147-151, 162, 192). After the State agency

denied her application, Starkey requested an administrative hearing, which was held on August

20, 2003 before ALJ James Pileggi. (R. 36-61). Plaintiff testified at the hearing and was

represented by counsel.

On November 15, 2003 the ALJ found that Starkey was not disabled. (R. 18). On March

8, 2004, the Appeals Council granted review and vacated and remanded the case, requiring the

ALJ to: (1) obtain evidence from a medical expert regarding the severity of Plaintiff's

impairments; (2) evaluate her subjective complaints; (3) evaluate her mental impairments in

accordance with the special technique described in 20 C.F.R. §416.920a; (4) give further

consideration to her maximum residual functional capacity (RFC); and (5) obtain evidence from

a vocational expert (VE) to clarify the effect of the assessed limitations on Plaintiff's

occupational base. (R. 129-131).

Following the remand by the Appeals Council, a supplemental hearing was held on May

27, 2004, at which Plaintiff and a VE testified. (R. 62-107). By decision dated September 9,

2004, the ALJ found that Starkey's impairments prevented her from performing any of her past

relevant work, but that she was not disabled because she could perform a significant number of

other jobs. (R. 18-26).

On December 1, 2004 the Appeals Council denied Plaintiff's request for review,

rendering the ALJ's decision the final decision of the Commissioner. (R. 5-7).

### III.   Facts

Plaintiff Starkey was born on January 17, 1968 and was 36 years old at the time of the

ALJ's decision, making her a younger individual under the regulations. (R. 67). Although she

previously claimed to have earned a GED (R. 290, 322), the ALJ accepted Starkey's more recent

statements that she has an eleventh grade education. (R. 19, 67, 198). She has past relevant

work experience as a certified nursing assistant, cleaner, mail coder, and child care attendant.

(R. 95, 193, 213). Starkey has a history of cervical cancer, but it is in remission and she has no

limitations as a result thereof. (R. 39, 69).

On March 15, 2001, Starkey presented to Frank E. Sessoms, M.D., complaining of a lack

of energy and inability to stay awake. Dr. Sessoms assessed possible sleep apnea and ordered a

sleep study. (R. 226). On August 16, 2001, a medical review team certified that Starkey met the

requirements of a disability under Listing 12.04 because of depression. (R. 227-28).

On April 9, 2002, the Bureau of Disability Determination requested medical records from

Dr. Frederic Price, whom Starkey had listed as a source of medical treatment from September

2001 through April 2002. (R. 256). During his examination on April 8, 2002, Dr. Price found

that although Starkey was anxious, she was oriented x3, fully alert, and had a normal mental

status. (R. 259). Dr. Price examined Starkey again on May 3, 2002 and opined that she had no

work-related functional limitations. (R. 257-258).

    *A.*    *Maria Sunseri, M.D.*

Plaintiff was referred to Dr. Sunseri, a neurologist specializing in sleep disorders.

(R. 365). On February 27, 2002, Starkey presented to Dr. Sunseri complaining of

hypersomnolence. Dr. Sunseri noted "questionable depression" as part of Starkey's past medical

history and her impression was "hypersomnia − possible narcolepsy although she has only one of the four characteristics." (R. 364). An MRI taken in May 2002 reported that Plaintiff's brain was normal. (R. 360). During the evening of August 20, 2002, Starkey underwent a sleep study which showed no significant sleep-disordered breathing, and Dr. Sunseri recommended good sleep hygiene. (R. 358-359). On October 9, 2002, Starkey presented to Dr. Sunseri for a follow-up visit. Dr. Sunseri again noted a questionable history of depression and indicated that Starkey "believes that her problem is depression and has been on Wellbutrin now for 2 months with some response." (R. 357).

After a March 12, 2003 visit, Dr. Sunseri noted Starkey's sleep difficulties and daytime napping and diagnosed her with narcolepsy despite the fact that she did not have three of the four symptoms of narcolepsy: sleep paralysis, hypnogogic hallucinations, or cataplexy. (R. 355). For treatment, Dr. Sunseri prescribed Dexedrine. (R. 393).

Starkey presented to Dr. Sunseri again on July 2, 2003 for a follow-up visit and the record indicates that "she has been doing quite well on the Dexedrine and is very happy about that. She does not nap during the day and is able to do things with her children. However she is not getting to bed until 2 AM and is getting up at 8 AM." (R. 393). Furthermore, Starkey's mood was improved, so she was taken off her antidepressant. Dr. Sunseri instructed Starkey not to take Dexedrine after 5:00 p.m. and advised her to take a one-hour afternoon nap and a short, fifteen minute nap in the morning. (R. 393).

As of October 22, 2003, Plaintiff did so well on Dexedrine that she called it a "wonder pill" that has helped her come alive and enabled her to do things. (R. 392). Dr. Sunseri noted an improved affect on Starkey, as she was quite happy with her new position as a night cleaner.

4

(R. 392). At the same time, Dr. Sunseri noted that Starkey sometimes took seven pills per day and was "burning the candle at both ends," sleeping only three hours per day. (R. 392).

In March 2004, Dr. Sunseri noted that Starkey began taking approximately eight pills per day. (R. 391). She was going to bed at 1:00 a.m., waking at 6:30 a.m. to help send her children to school, and returning to bed at 8:00 a.m. (R. 391). Starkey was no longer napping during the day and was not following the prescribed doses of Dexedrine. (R. 391). Dr. Sunseri instructed her to get eight to ten hours of sleep and to take five milligrams of Dexedrine every three hours as needed. (R. 391).

On April 14, 2004, Dr. Sunseri completed a medical questionnaire on which she reiterated her prior diagnosis of narcolepsy and opined that Starkey needed complete freedom to rest throughout the day because she can fall asleep at inappropriate times. (R. 389-390). At the same time, Dr. Sunseri reported that Starkey is able to sit for eight hours, stand for four to five hours, and walk for eight hours per workday. (R. 387).

      *B.*     *Ann Kosturek, M.D.*

Ann Kosturek, M.D., a psychiatrist from Mercy Behavioral Health, began treating Starkey in August 2002. Dr. Kosturek reported that Starkey complained of depression, excessive sleep approaching fourteen to fifteen hours per day, decreased energy, and financial and relationship difficulties. (R. 290). She also noted one psychiatric hospitalization because of a pill overdose. (R. 290). Dr. Kosturek indicated further that there was no improvement in Starkey's symptoms despite various medications. In addition, Starkey "has had organic work-up because of her on going sleeping problems and feeling very tired." (R. 290-91). The records further note that Starkey had to quit her job because she fell asleep several times on the job. (R. 297).

Nevertheless, Starkey had "minor" difficulties with other people and transportation (R. 309); fewer difficulties with cleaning at home; and "no difficulties" with laundry, shopping, or cooking. (R. 311). She tended to be emotional, but had no suicidal or homicidal tendencies, no psychosis, no delusions, no looseness of associations, and fair insight and judgment. (R. 290). Dr. Kosturek noted a GAF score of 55 for Starkey and diagnosed her with a major depressive disorder. (R. 291).

Plaintiff continued to complain of a depressed mood and decreased concentration in December 2002, but Dr. Kosturek reported that Starkey was fully oriented, calm, and appropriate. (R. 317-18). Furthermore, she had logical thought processes, normal speech, fair intelligence/general knowledge, and fair to good memory. (R. 317-18). Although Starkey's tendency to fall asleep had a negative affect on her concentration, persistence and pace, it did not cause her difficulty in performing daily activities on a sustained basis. (R. 319).

Dr. Kosturek met with Starkey again in July 2003 shortly after her brother died suddenly. (R. 396). Starkey continued to remain alert and fully oriented with logical thought process and no psychomotor abnormalities, although her attention and concentration appeared to be impaired. At the same time, Starkey's insight and judgment were good. (R. 397). She was diagnosed with depressive disorder, not otherwise specified and her GAF score remained at 55, the same as the prior year. (R. 397).

      C.     *Lawrence Haddad, Ph.D.*

At the request of the Social Security Administration, Lawrence Haddad, Ph.D. conducted a mental examination of Starkey on January 6, 2003. (R. 321-326). Dr. Haddad reached many of the same conclusions as Dr. Kosturek, *viz.*, that Plaintiff had no unusual behaviors, no delusions,

6

no suicidal thoughts, average intellect, mildly impaired concentration/attention and intact social judgment.  (R. 322-324).  Starkey could reasonably be expected to perform household chores, handle financial issues, shop, cook, use public transportation, initiate social contact, relate appropriately, communicate adequately, and get along with others.  (R. 325).  Although Starkey had a fair ability to function independently and the ability to understand, remember, and carry out simple instructions, she had a poor ability to deal with the public or work-related stress and a poor ability to maintain attention and concentration.  (R. 325).  Dr. Haddad diagnosed a long-term depressive disorder, which he identified as a dysthymic disorder.  (R. 324).  He also suggested a pronounced sleep disorder, but deferred to the physician for a definitive diagnosis.  Dr. Haddad assessed that Starkey had a poor ability to:  deal with the public, deal with work stresses, maintain attention and concentration, and in demonstrating reliability.  He also noted that Starkey would have difficulties performing activities within a schedule, attending to task from beginning to end, and in sustaining a routine.  (R. 321-26).

     *D.*     *Sharon Tarter, Ph.D.*

The non-examining state physician, Dr. Sharon Tarter, reviewed Plaintiff's medical records in January 2003.  Dr. Tarter found that Starkey's daily living, social functioning, and ability to maintain concentration, persistence, or pace were all moderately limited.  (R. 341).  Dr. Tarter further opined that Starkey was able to understand, retain, and follow simple instructions and successfully perform routine, repetitive tasks.  (R. 327-329).

     *E.*     *Hearing Testimony and Record Evidence*

At the hearing before the ALJ, Plaintiff testified that she returned to work as a cleaner, working eight hours per day for three days a week.  (R. 41, 45).  Although she was continuously

late for work, she never fell asleep on the job (R. 47, 80), and her employer was satisfied with her work performance. (R. 67-68). Starkey soon quit her position, however, because of her frequent tardiness. (R. 68).

Starkey testified that while on her medication she slept eight hours per day when working. (R. 45). When she was not working, however, Starkey went off her medication and slept for twenty hours per day. (R. 46, 56). Starkey testified that she also napped three times per day, with each nap lasting one to one and one-half hours. (R. 76-77).

Plaintiff claimed no trouble walking, standing, or sitting (R. 70), but averred that she could not walk more than one-half of a mile or sit for more than thirty minutes. (R. 185). Starkey testified that she had no vocationally limiting physical problems. (R. 43-44). Finally, she testified that she had no problem with attention, concentration, or memory (R. 48), but later claimed that she had decreased concentration. (R. 82).

Plaintiff's medical records showed that she socialized with at least one other friend (R. 353), was sexually active with her boyfriend (R. 269, 290), and was able to "do things," including activities with her children. (R. 392-93). Contrary to this record evidence, Starkey testified that she did not participate in any activities outside her home and socialized only with her sister. (R. 51, 74).

A medical expert, Philip Balk, M.D., was called to testify at the ALJ hearing. Dr. Balk disagreed with Dr. Sunseri's diagnosis of narcolepsy because Starkey had only one of the four required criteria. (R. 85-88).

Frances N. Kinley, M.Ed., a vocational expert, was asked by the ALJ to testify whether a hypothetical individual with an eleventh grade education could participate in a number of jobs

8

that are limited in nature to simple, repetitive tasks that involve no shift work, no heights, no

dangerous machinery, no motor vehicles, no team-type activities, no more than incidental public

contact, and no close attention to detail or requirement to be constantly alert.  (R. 95-96).

According to the VE's testimony, although Starkey cannot return to her past relevant work, she is

able to work as a packer, assembler, or general office clerk.  (R. 99).  Any one of these jobs

would allow Starkey to nap during breaks and lunchtime.  (R. 100).


## IV.    Standards of Review

Judicial review of the Commissioner's final decision on disability claims is provided by

42 U.S.C. §§ 405(g)[1] and 1383(c)(3).[2]  Section 405(g) permits a district court to review

transcripts and records upon which a determination of the Commissioner is based.  Because the

standards for eligibility under Title II (42 U.S.C. §§ 401-433, regarding DIB), and judicial review

thereof, are virtually identical to the standards under Title XVI (42 U.S.C. §§ 1381-1383f,

regarding Supplemental Security Income, or "SSI"), disability decisions rendered under Title II

are pertinent to those rendered under Title XVI.  *Sullivan v. Zebley*, 493 U.S. 521, 525 n. 3

(1990).

---

[1] Section 405(g) provides in pertinent part:
> Any individual, after any final decision of the [Commissioner] made after a hearing to which he
> was a party, irrespective of the amount in controversy, may obtain a review of such decision by a
> civil action . . . brought in the district court of the United States for the judicial district in which the
> plaintiff resides, or has his principal place of business . . . .

[2] Section 1383(c)(3) provides in pertinent part:
> The final determination of the Commissioner of Social Security after a hearing under paragraph (1)
> shall be subject to judicial review as provided in section 405(g) of this title to the same extent as
> the Commissioner's final determinations under section 405 of this title.

9

If supported by substantial evidence, the Commissioner's factual findings must be accepted as conclusive. *Ventura v. Shalala*, 55 F.3d 900, 901 (3d Cir. 1995); *Wallace v. Secretary of HHS*, 722 F.2d 1150, 1152 (3d Cir. 1983). The district court's function is to determine whether the record, *as a whole*, contains substantial evidence to support the Commissioner's findings. *See Adorno v. Shalala*, 40 F.3d 43, 46 (3d Cir. 1994), *citing Richardson v. Perales*, 402 U.S. 389, 401 (1971). The Supreme Court has explained that "substantial evidence" is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson,* 402 U.S. at 401 (citation omitted). *See Jones v. Barnhart,* 364 F.3d 501, 503 (3d Cir. 2004). The United States Court of Appeals for the Third Circuit has referred to this standard as "less than a preponderance of the evidence but more than a mere scintilla." *Jones,* 364 F.3d at 503, *quoting Jesurum v. Secretary of the Dep't of Health and Human Servs.*, 48 F.3d 114, 117 (3d Cir. 1995). "A single piece of evidence will not satisfy the substantiality test if the [Commissioner] ignores, or fails to resolve, a conflict created by countervailing evidence." *Mason v. Shalala,* 994 F.2d 1058, 1064 (3d Cir. 1993), *quoting Kent v. Schweiker*, 710 F.2d 110, 114 (3d Cir. 1983). The substantial evidence standard allows a court to review a decision of an ALJ, yet avoid interference with the administrative responsibilities of the Commissioner. *Stewart v. Secretary of HEW*, 714 F.2d 287, 290 (3d Cir. 1983).

In making this determination, the district court considers and reviews only those findings upon which the ALJ based the decision, and cannot rectify errors, omissions or gaps therein by supplying additional findings from its own independent analysis of portions of the record which were not mentioned or discussed by the ALJ. *Fargnoli v. Massarini,* 247 F.3d 34, 44 n.7 (3d Cir.

10

2001) ("The District Court, apparently recognizing the ALJ's failure to consider all of the relevant and probative evidence, attempted to rectify this error by relying on medical records found in its own independent analysis, and which were not mentioned by the ALJ.  This runs counter to the teaching of *SEC v. Chenery Corp.*, 318 U.S. 80 (1943), that '[t]he grounds upon which an administrative order must be judged are those upon which the record discloses that its action was based.' *Id.* at 87";  parallel and other citations omitted).

An ALJ must do more than simply state factual conclusions, but instead must make specific findings of fact to support the ultimate findings. *Stewart*, 714 F.2d at 290.  In making a determination, the ALJ must consider and weigh all of the evidence, both medical and non-medical, that support a claimant's subjective testimony about symptoms and the ability to work and perform activities, and must specifically explain the reasons for rejecting such supporting evidence, especially when testimony of the claimant's treating physician is rejected. *Burnett v. Commissioner of Social Security*, 220 F.3d 112, 119-20 (3d Cir. 2000). *See Wier on Behalf of Wier v. Heckler*, 734 F.2d 955, 961 (3d Cir. 1984); *Cotter v. Harris*, 642 F.2d 700, 705 (3d Cir. 1981).  Moreover, an ALJ may not substitute his or her evaluation of medical records and documents for that of a treating physician: "an ALJ is not free to set her own expertise against that of a physician who presents competent evidence" by independently "reviewing and interpreting the laboratory reports" and other objective medical evidence. *Ferguson v. Schweiker*, 765 F.2d 31, 37 (3d Cir. 1985).

To demonstrate disability under Title II or Title XVI of the Act, a claimant must demonstrate an inability to "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which

11

has lasted or can be expected to last for a continuous period of not less than twelve months."

42 U.S.C. § 423 (d)(1); 42 U.S.C. § 1383c(a)(3)(A). When resolving the issue of whether a

claimant is disabled and whether the claimant is entitled to either DIB or SSI benefits, the

Commissioner applies a five-step analysis. 20 C.F.R. §§ 404.1520 and 416.920 (1995). *See*

*Sullivan*, 493 U.S. at 525. The United States Court of Appeals for the Third Circuit summarized

this five step process in *Plummer v. Apfel*, 186 F.3d 422 (3d Cir. 1999) as follows:

> In *step one*, the Commissioner must determine whether the claimant is
> currently engaging in substantial gainful activity. 20 C.F.R. § 404.1520(a). If a
> claimant is found to be engaged in substantial activity, the disability claim will
> be denied . . . . In *step two*, the Commissioner must determine whether the
> claimant is suffering from a severe impairment. 20 C.F.R. § 404.1520(c). If the
> claimant fails to show that her impairments are "severe," she is ineligible for
> disability benefits.
>
> In *step three*, the Commissioner compares the medical evidence of the
> claimant's impairment to a list of impairments presumed severe enough to
> preclude any gainful work. 20 C.F.R. § 404.1520(d). If a claimant does not
> suffer from a listed impairment or its equivalent, the analysis proceeds to steps
> four and five. *Step four* requires the ALJ to consider whether the claimant
> retains the residual functional capacity to perform her past relevant work.
> 20 C.F.R. § 404.1520(d). The claimant bears the burden of demonstrating an
> inability to return to her past relevant work . . . .
>
> If the claimant is unable to resume her former occupation, the evaluation
> moves to the final *step [five]*. At this stage, the burden of production shifts to
> the Commissioner, who must demonstrate the claimant is capable of performing
> other available work in order to deny a claim of disability. 20 C.F.R.
> § 404.1520(f). The ALJ must show there are other jobs existing in significant
> numbers in the national economy which the claimant can perform, consistent
> with her medical impairments, age, education, past work experience, and
> residual functional capacity. The ALJ *must analyze the cumulative effect of all
> the claimant's impairments* in determining whether she is capable of performing
> work and is not disabled. The ALJ will often seek the assistance of a vocational
> expert at this fifth step . . . .

*Plummer*, 186 F.3d at 428 (emphasis added; certain citations omitted).

Thus, a claimant may demonstrate that his or her impairment is of sufficient severity to qualify for benefits in one of two ways:

(1) by introducing medical evidence that the claimant is disabled *per se* because he or she meets the criteria for one or more of a number of serious Listed Impairments delineated in 20 C.F.R. No. 4, Subpt. P, Appendix 1, or that the impairment is *equivalent* to a Listed Impairment. *See Heckler v. Campbell*, 461 U.S. 458, 460 (1983); *Stunkard*, 841 F.2d at 59; *Kangas*, 823 F.2d at 777 (Steps 1-3); or,

(2) in the event that claimant suffers from a less severe impairment, he or she will be deemed disabled where the claimant is nevertheless unable to engage in "any other kind of substantial gainful work which exists in the national economy . . . ." *Campbell*, 461 U.S. at 461, *citing* 42 U.S.C. § 423 (d)(2)(A). In order to prove disability under this second method, claimant first must demonstrate the existence of a medically determinable disability that precludes him or her from returning to his or her former job (Steps 1-2, 4). *Stunkard,* 841 F.2d at 59; *Kangas,* 823 F.2d at 777. Once it is shown that claimant is unable to resume previous employment, the burden shifts to the Commissioner (Step 5) to prove that, given plaintiff's mental or physical limitations, age, education and work experience, he or she is able to perform substantial gainful activity in jobs available in the national economy. *Campbell*, 461 U.S. at 461; *Stunkard*, 842 F.2d at 59; *Kangas*, 823 F.2d at 777; *Doak v. Heckler*, 790 F.2d 26, 28 (3d Cir. 1986); *Rossi v. Califano*, 602 F.2d 55, 57 (3d Cir. 1979).

Where a claimant has multiple impairments which, individually, may not reach the level of severity necessary to qualify as a Listed Impairment, the ALJ/Commissioner nevertheless must consider all of the claimant's impairments in combination to determine whether, collectively,

13

they meet or equal the severity of a Listed Impairment. *Burnett*, 220 F.3d at 122 ("the ALJ must

consider the combined effect of multiple impairments, regardless of their severity"); *Bailey v.*

*Sullivan*, 885 F.2d 52 (3d Cir. 1989) ("in determining an individual's eligibility for benefits, the

'[Commissioner] shall consider the combined effect of all of the individual's impairments

without regard to whether any such impairment, if considered separately, would be of such

severity'"), *citing* 42 U.S.C. § 423(d)(2)(C), and 20 C.F.R. § § 404.1523, 416.923.

Section 404.1523, Multiple impairments, provides:

> In determining whether your physical or mental impairment or impairments are of
> a sufficient medical severity that such impairment or impairments could be the
> basis of eligibility under the law, we will consider the combined effect of all of
> your impairments without regard to whether any such impairment, if considered
> separately, would be of sufficient severity. If we do find a medically severe
> combination of impairments, the combined impact of the impairments will be
> considered throughout the disability determination process. If we do not find that
> you have a medically severe combination of impairments, we will determine that
> you are not disabled (see § 404.1520).

Thus, when a claimant presents more than one impairment, "the combined effect of the

impairment must be considered before the [Commissioner] denies the payment of disability

benefits." *Bittel,* 441 F.2d at 1195. Even if a claimant's impairment does not meet the criteria

specified in the listings, he must be found disabled if his condition is *equivalent* to a listed

impairment. 20 C.F.R. § 404.1520(d) (2002). To that end, the ALJ may not just make

conclusory statements that the impairments do not equal a Listed Impairment in combination or

alone, but rather, is required to set forth the reasons for the decision, and specifically explain why

a claimant's impairments did not, alone or in combination, equal in severity one of the Listed

Impairments. *Fargnoli,* 247 F.3d at 40 n. 4, *citing Burnett*, 220 F.3d at 119-20.

14

If the ALJ or Commissioner believes the medical evidence is inconclusive or unclear as to whether the claimant is unable to return to past employment or perform substantial gainful activities, it is incumbent upon the ALJ to "secure whatever evidence [believed necessary] to make a sound determination." *Ferguson*, 765 F.2d at 36.

Pain alone, if sufficiently severe, may be a disabling impairment that prevents a claimant from performing any substantial gainful work. *E.g., Carter v. Railroad Retirement Board,* 834 F.2d 62, 65 (3d Cir. 1987), *relying on Green v. Schweiker*, 749 F.2d 1066, 1068 (3d Cir. 1984); *Smith v. Califano,* 637 F.2d 968, 972 (3d Cir. 1981); *Dobrowolsky v. Califano*, 606 F.2d 403, 409 (3d Cir. 1979). Similarly, an ALJ must give great weight to a claimant's subjective description of inability to perform even light or sedentary work when this testimony is supported by competent evidence. *Schaudeck v. Commissioner of Social Security*, 181 F.3d 429, 433 (3d Cir. 1999), *relying on Dobrowolsky*. When a medical impairment that could reasonably cause the alleged symptoms exists, the ALJ must evaluate the intensity and persistence of the pain or symptom, and the extent to which it affects the individual's ability to work. This evaluation obviously requires the ALJ to determine the extent to which a claimant is accurately stating the degree of pain or the extent to which he or she is disabled by it. *See* 20 C.F.R. § 404.1529(c) (2002). *Hartranft v. Apfel*, 181 F.3d 358, 362 (3d Cir. 1999).

If an ALJ concludes the claimant's testimony is not credible, the specific basis for such a conclusion must be indicated in the decision. *See Cotter*, 642 F.2d at 705. The United States Court of Appeals for the Third Circuit has stated: "[I]n all cases in which pain or other symptoms are alleged, the determination or decision rationale must contain a thorough discussion and analysis of the objective medical and the other evidence, including the individual's

complaints of pain or other symptoms and the adjudicator's personal observations. The rationale

must include a resolution of any inconsistencies in the evidence as a whole and set forth a logical

explanation of the individual's ability to work." *Schaudeck*, 181 F.3d at 433, *quoting* Social

Security Ruling ("SSR") 95-5p.

Subjective complaints of pain need not be "fully confirmed" by objective medical

evidence in order to be afforded significant weight. *Smith*, 637 F.2d at 972; *Bittel*, 441 F.2d at

1195. Although "there must be objective medical evidence of some condition that could

reasonably produce pain, there need not be objective evidence of the pain itself." *Green,* 749

F.2d at 1070-71, *quoted in Mason,* 994 F.2d at 1067. Where a claimant's testimony as to pain is

reasonably supported by medical evidence, neither the Commissioner nor the ALJ may discount

claimant's pain without contrary medical evidence. *Ferguson*, 765 F.2d at 37; *Chrupcala v.*

*Heckler*, 829 F.2d 1269, 1275-76 (3d Cir. 1987). "Once a claimant has submitted sufficient

evidence to support his or her claim of disability, the Appeals Council may not base its decision

upon mere disbelief of the claimant's evidence. Instead, the Secretary must present *evidence to*

*refute the claim. See Smith v. Califano*, 637 F.2d 968, 972 (3d Cir. 1981) (where claimant's

testimony is reasonably supported by medical evidence, the finder of fact may not discount the

testimony without contrary medical evidence)."


## V.    Analysis

Plaintiff Starkey makes three arguments on appeal. First, she claims the ALJ did not give

adequate consideration to her physical and psychological limitations or impairments. Second,

she argues that the ALJ did not adequately consider medical source opinions that clearly

confirmed her physical and psychological limitations.  Finally, she contends the ALJ ignored her credible testimony regarding her limitations.

A.    Adequate Consideration Was Given To Plaintiff's Psychological And Physical Limitations

In arguing that the ALJ did not give adequate consideration to her physical and psychological limitations or impairments, Starkey claims that the ALJ ignored Dr. Sunseri's diagnosis of narcolepsy which causes her "to fall asleep at inappropriate times" and requires that she have "complete freedom to rest frequently."  (R. 389-390).  Starkey claims that these limitations preclude her from any type of gainful employment. Pl Br. at 9.  She also claims a history of significant depression.  Pl. Br. at 3-4.

In his September 9, 2004 decision, the ALJ gave due consideration to both narcolepsy and depression.  Regarding Starkey's alleged narcolepsy, the ALJ noted that her physician, Dr. Sunseri, reported that Starkey's sleep impairments were probably caused by her own inability to follow doctor's orders regarding good sleep hygiene. (R. 22).  Dr. Sunseri prescribed Dexedrine and recommended that Starkey get eight to ten hours sleep per night along with a fifteen minute morning nap and a one-hour afternoon nap. (R. 393).  After following the prescription for a month, Plaintiff was very happy and doing so well that she described Dexedrine as a "wonder drug." (R. 392).  Inexplicably, however, Starkey began to increase her daily dosage and began sleeping only five and a half hours a night. (R. 391).  This behavior was contrary to the regulations, which state: "to get benefits, you must follow treatment prescribed by your physician . . . ." 20 C.F.R. §416.930 (2004).  Similarly, the Third Circuit has held that failure to take one's medication indicates the impairment is not of disabling severity. *Welsh v. Heckler,*

17

808 F.2d 264, 270 (3d Cir. 1986). The foregoing facts and legal principles, along with Dr.

Sunseri's finding that Starkey's GAF score was 55, were all considered by the ALJ. (R. 22-23).

In addition, the ALJ recognized that Starkey has "nonexertional limitations associated

with the combined effects of major depression and narcolepsy." (R. 21). Nevertheless, he did

not find Starkey's assertions regarding her limitations to be entirely credible for the reasons

explained in section V.C., *infra.* Accordingly, the ALJ concluded that Starkey did not need to

nap or rest so extensively that she cannot perform sustained work. (R. 22). This finding by the

ALJ is directly supported by the medical record, where Dr. Sunseri noted that as of July 2, 2003

(R. 393) and March 31, 2004 (R. 391), Starkey was not napping during the day. Those same

reports confirm the ALJ's finding that Starkey "actually does not get sufficient sleep during the

nighttime, as she goes to bed quite late and wakes up early to get her children off to school."

(R. 22).

Furthermore, the medical record supports the ALJ's conclusion that although Starkey

experiences fatigue because of her impairments, her treatment was sporadic since her alleged

onset date. (R. 23). The ALJ correctly noted that on March 22, 2002, Starkey's case was closed

by Mercy Behavioral Health because of a lack of contact. (R. 312). Although she resumed

treatment on August 13, 2002 (R. 316), it was concluded as of December 18, 2002. (R. 320).

Starkey then returned to Mercy Behavioral Health on July 22, 2003 after her brother died

unexpectedly. (R. 396). Although Starkey's attention and concentration appeared impaired, her

thought process was logical and organized and her insight and judgment were good. (R. 397).

Moreover, Starkey's GAF was 55, the same as the year before. (R. 397). Accordingly, the ALJ's

assessment of Starkey's depression is supported by the record.

B.      *Adequate Consideration Was Given To A Variety Of Medical Opinions*

Starkey next claims the ALJ did not adequately consider source opinions that "clearly confirm" her psychological and physical limitations or impairments. Pl. Br. at 9. Specifically, Starkey claims the ALJ did not credit the opinions of Doctors Sunseri, Haddad, and Balk which "confirm" her limitations caused by narcolepsy and depression.

As noted previously, Dr. Sunseri's notes indicate that Starkey's sleep problems result from her inability or unwillingness to follow her prescribed medication and recommended sleep regimen. Accordingly, the ALJ properly concluded that Dr. Sunseri's records contradicted Starkey's supposed need for extensive daytime sleeping. (R. 22). Furthermore, Dr. Sunseri initially diagnosed a *possibility* of narcolepsy because Starkey has only one of the four prerequisites to such a diagnosis. (R. 364). Dr. Sunseri later diagnosed Starkey with narcolepsy in spite of the fact that she still possessed only one of the four prerequisites. (R. 355).

With respect to the examining psychologist, Dr. Haddad, Starkey argues that his finding that she had a "poor" ability to deal with work stress, to deal with the public, and maintain attention and concentration, precluded employment and that the ALJ conceded this point. Pl. Br. at 10. This mischaracterizes the record. As the Commissioner noted in her brief, Dr. Haddad's report did not define "poor" to mean that Starkey had "no ability" or an "unsatisfactory" ability in those areas. (R. 321-26). During the hearing, Plaintiff's counsel propounded a hypothetical question to the VE that defined "poor" to mean "unsatisfactory to the employer." (R. 104). This question was tautalogical, *see, e.g., Joseph Gerard Brennan, A Handbook of Logic* 98 (Harper & Brothers 1957), and the ALJ properly recognized it as such when he stated on the record that "the question answers itself." (R. 104). In sum, the ALJ duly considered Dr. Haddad's opinions of

19

Starkey's RFC and did not err when he rejected Plaintiff's argument that a rating of "poor" in some categories meant, *ipso facto,* that Starkey cannot work at all.

The ALJ also reviewed the testimony of Dr. Balk, a medical expert who reviewed Starkey's medical records from Dr. Sunseri. Dr. Balk questioned the narcolepsy diagnosis because the record clearly indicated that Starkey possessed only one of the four prerequisites for narcolepsy. (R. 85-88). Furthermore, Dr. Balk opined that Starkey is less likely to nap when she is involved in a number of activities. (R. 89). In addition, Dr. Balk testified that Starkey's fatigue was caused by "[l]ack of good sleep . . . and reduction of cognitive skills . . . ." as well as side effects of medication. (R. 90-92). In light of the foregoing testimony of Dr. Balk, the ALJ wrote: "Dr. Balk noted that the claimant's depression can also result in the hypersomnolence associated with narcolepsy. . . . [T]he more the claimant is engaged in activities, the less likely it is for her to nap. Dr. Balk noted that the claimant's assertions with respect to fatigue can often be associated with depression or the side effects of her various medications." (R. 22). Because the foregoing conclusions are consistent with Dr. Balk's testimony, Plaintiff's claim that the ALJ did not give adequate consideration to Dr. Balk's opinions is unpersuasive as well.

### C.   *Numerous Contradictions Undermined Plaintiff's Credibility*

Starkey last claims that the ALJ erred when he made an adverse credibility determination regarding her physical and psychological limitations. Pl. Br. at 9. The regulations require the ALJ to determine whether the claimant's symptoms are consistent with medical evidence. 20 C.F.R. §416.929(c). In addition, the regulations provide that the ALJ should consider other relevant factors, such as the claimant's daily activities and the effectiveness of treatment and

medication to alleviate the claimant's pain or symptoms.  20 C.F.R. §416.929(c)(3).  The record in this case demonstrates both that the ALJ followed the regulations and that numerous contradictions supported his adverse credibility determination.

First, Starkey claimed that her employer was satisfied with her performance at her new job as a night cleaner, yet she quit because she was "frequently late to work." (67-68).  In addition, Starkey testified she slept twenty hours per day (R. 45, 46, 56), but the medical records indicate that she complained of sleeping fourteen to fifteen hours per day.  (R. 290).  Likewise, the ALJ correctly noted that the medical records indicate that Starkey complained of fatigue because of too little sleep, rather than too much.  (R. 22, 355, 363, 391-93).  Third, Starkey testified at the hearing that she napped three times per day for at least an hour (R. 76-77), but Dr. Sunseri's clinical records indicate that she did not nap.  (R. 391, 393).

Finally, Starkey claimed that she did not participate in any activities outside the home and did not socialize with anyone except her sister.  (R. 51, 74).  But her medical records show that she had a boyfriend, was sexually active, socialized with at least one friend, was able to "do things," including activities with her children.  (R. 269, 290, 353, 392-93).  In light of the foregoing, substantial evidence exists in the record to support the ALJ's adverse credibility determination.

21

## VI.     Conclusion

The Court has reviewed the ALJ's findings of fact and decision and determines that his ruling is supported by substantial evidence.  Accordingly, the Court will deny Plaintiff's motion for summary judgment, grant the Commissioner's motion for summary judgment, and affirm the decision below.

An appropriate order follows.

Thomas M. Hardiman
United States District Judge

Dated: December __7__, 2005

cc: counsel of record

22